**The relief described hereinbelow is SO ORDERED.**

**SIGNED this 19th day of February, 2015.**



_____
Robert D. Berger
United States Bankruptcy Judge
_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

In re:

**GEORGE A. JOHNSON and**
**MELANIE RANEY-JOHNSON,**                          Case No. 11-23108
       Debtors.

**GEORGE A. JOHNSON and**
**MELANIE RANEY-JOHNSON,**
       Plaintiffs,

       v.                                                                               Adv. No. 11-6250

**SALLIE MAE, INC., and**
**EDUCATIONAL CREDIT**
**MANAGEMENT CORPORATION,**
       Defendants.

### MEMORANDUM OPINION AND ORDER
### DISCHARGING DEBTORS' STUDENT LOAN

The Court considers Debtors' Complaint to Determine Dischargeability of Student Loan

(Doc. 1) owed to Educational Credit Management Corporation (ECMC).[1]  The Court has

---

[1] Debtors George A. Johnson and Melanie Raney-Johnson appear *pro se*.  Defendant Educational Credit Management Corporation appears by its attorney, N. Larry Bork of Goodell, Stratton, Edmonds & Palmer, L.L.P., Topeka, KS.  By the Court's order of April 24, 2012, Sallie Mae, Inc., was dismissed as a defendant in this adversary proceeding.

15.02.19.A Johnson v ECMC Judgment Order.wpd

reviewed the pleadings and court file and heard arguments of the parties. For the reasons set out below, the Court finds that repayment of Debtors' student loan to Educational Credit Management Corporation would constitute an undue hardship and Debtors are entitled to discharge the loan as provided in 11 U.S.C. § 523(a)(8).[2]

**Findings of Fact**

Debtors George A. Johnson and Melanie Joy Raney-Johnson filed this chapter 7 bankruptcy case on November 10, 2011. The Debtors filed this case hopefully to resolve issues with one of their home mortgagees, Bank of America. This case has been discharged and the Trustee has abandoned the estate's interest in Debtors' administered property and interests.

In this proceeding, the Debtors seek to discharge under § 523(a)(8) their consolidated student loan. The balance due on this joint spousal consolidation student loan is approximately $83,000 ("Loan"). This Loan was created by a consolidation of Debtors' individual student loans in 2005. The Debtors do not contest the balance on the Loan or that it falls within the ambit of § 523(a)(8). The original amount borrowed by George was $25,000 and by Melanie was $20,000; these loans were incurred during the 1990s.

George Johnson is approximately 38 years old and his wife, Melanie Johnson, is approximately 36 years old. They were married in 1999 and have three minor children: Maya (11 years old), Xavier (8 years old) and Trey (5 years old). Neither George nor Melanie has any mental or physical disabilities that keep them from working; their children also have no mental or physical disabilities. However, George regularly needs allergy shots. One of their children has asthma. Their daughter recently received orthodontia. All of their parents are alive.

Amended Schedule A reflects a home value of $125,000 and secured debt on the home of $162,728. The home is encumbered by two mortgages. Debtors' current monthly first mortgage

---

[2] This matter is a core proceeding under 28 U.S.C. §157(b)(2)(I). This Court has jurisdiction under 28 U.S.C. §157 and 1334. Venue is proper pursuant to 28 U.S.C. §1408 and 1409. All future statutory references are to the Bankruptcy Code ("Code"), as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, 11 U.S.C. §§ 101 - 1532, unless otherwise specifically noted.

- 2 -

15.02.19.A Johnson v ECMC Judgment Order.wpd

payment is $1,320, and the balance due on Schedule D is $130,470. The second mortgage note was discharged in this bankruptcy case. The Debtors' expenses only reflect payment on the first mortgage; although the debt on the second mortgage was discharged, this Court's file indicates that the lien remains. The Court is uncertain why a budget expense is not listed for the second mortgage payment. The balance on the second mortgage note is $32,258.

Melanie Johnson obtained loans while attending the University of California-Davis from 1994 through 1999. These loans were the subject of an individual consolidation that initially occurred on March 28, 2003, and then again on April 26, 2004. Those loans were zeroed out as a result of the spousal consolidation loan that occurred on August 26, 2005 (the Loan).

George Johnson obtained loans to attend the University of St. Mary from 1995 through 1997. He then consolidated those loans individually on July 23, 2004, and then again into the spousal consolidation loan on August 26, 2005 (the Loan). The Loan had an initial disbursement of approximately $63,000.00.

Melanie attended the University of California at Davis from August 1994 to June 1999 with a major in biology. She claims to have almost obtained her degree, but did not complete it. Melanie is one class short of a biology degree. She states that her positions with the federal government were obtained in part because of her education.

George attended Labette Community College in Parsons, Kansas, from August 1992 through 1994 and obtained an associate's degree. He then continued his education at the University of St. Mary in Leavenworth, Kansas, from August 1994 through December 1996. He received a bachelor's degree in sociology.

Melanie has health care through her employment which covers George as well. Their children have coverage through the State of Kansas. The following are the expenses detailed in their responses to interrogatories and on their Schedule J:

- 3 -

15.02.19.A Johnson v ECMC Judgment Order.wpd

Case 11-06250   Doc# 63   Filed 02/19/15   Page 3 of 19

| Expense Category | 2012 Interrogatories | Oct. 2011 Schedule J |
|---|---|---|
| Mortgage | $1,319.00 | $1,402.00 |
| Maintenance | 100.00 | 100.00 |
| Electricity | 149.00 | -0- |
| Heat | 48.00 | -0- |
| Heating/Electricity | -0- | 257.00 |
| Water | 85.00 | 89.00 |
| Telephone | 200.00 | 140.00 |
| Bundle (Internet/TV) | -0- | 110.00 |
| Transportation | 400.00 | 400.00 |
| Insurance | 146.00 | -0- |
| Auto Insurance | -0- | 165.00 |
| Groceries | 600.00 | 600.00 |
| Eating out | 125.00 | -0- |
| Laundry | 100.00 | 100.00 |
| Recreation | 200.00 | 100.00 |
| Medicine | 25.00 | -0- |
| Medical/Dental | 75.00 | 200.00 |
| Clothing | 200.00 | 200.00 |
| Childcare | 150.00 | -0- |
| Personal Loan to Uncle | 100.00 | 150.00 |
| **TOTAL** | **$ 4,021.84** | **$ 4,013.00** |

The Schedule I filed in October 2011 states that George had gross monthly income of approximately $2,450 and net monthly income of approximately $2,010. Melanie had gross monthly income of approximately $2,900 and net monthly income of approximately $2,222. Thus, pursuant to the October 2011 Schedule I, the Debtors had total net monthly income of approximately $4,232. The 2012 interrogatory responses reflect take-home pay for George of $2,010.00 and Melanie of $2,222.00 for a total of $4,232.00. However, at the time of trial, George had been laid off.

George enjoyed steady employment for approximately two-and-one-half years working at The Guidance Center making about $27,000 a year. As of November 2012, George no longer worked at The Guidance Center because he was laid off and is currently employed as a substitute teacher, coach, and referee. His total income for 2013 was approximately $1,100. Prior to November 2012, George was paid every two weeks. A pay stub was provided for the period

- 4 -

15.02.19.A Johnson v ECMC Judgment Order.wpd

Case 11-06250    Doc# 63    Filed 02/19/15    Page 4 of 19

ending August 4, 2012. At that pay period, he had year-to-date income of $19,559 and year-to-date deductions and withholdings totaling $2,019 and $1,266, leaving net income of $16,274. That pay date was the 17th of 26 total paydays, which extrapolated to an annual net income of $24,900 and monthly net income of $2,075. As noted, in November 2012, George was discharged from his employment.

Melanie has had employment for the last two-plus years. She is currently working at the Department of Veteran Affairs as a billing supervisor making approximately $39,000 a year. Before that, she had another job in government. She has had the same employer for a little over two years and has received promotions.

In 2010, the Debtors received a tax refund of approximately $8,500; this refund occurred because of a one-time federal tax credit associated with the purchase of their residence. In 2011, they had a net tax refund of approximately $100.

George has a KPERS retirement plan with a balance of approximately $3,000 and Melanie has a federal government retirement plan with a balance of approximately $2,500. The Debtors own a 2000 GMC Sierra and a 1998 Volvo, valued on Schedule B at $2,500 and $1,500, respectively.

Melanie provided a pay stub for a period ending July 28, 2012, with a pay date of August 3, 2012. This was prior to her promotion from a GS-6 to GS-7. Her year-to-date gross pay was $25,862 and her year-to-date net pay was $18,666. This was her sixteenth paycheck. Extrapolated, that would result in annual net pay of $30,330 or $2,525 a month. Melanie is at the leader level, GS-7, Step 2. Her time frame for promotion to a supervisor, which ranges from GS-9 to GS-11, may be as long as 20 years (this is how long it took her current supervisor to reach that grade).

For 2011, George had taxable income of $27,220 and total wages of $29,038. For their 2011 tax return, the Debtors showed total wages of $55,402, so of that amount approximately $28,000 would have been attributable to the income of Melanie.

- 5 -

Because of federal budgetary issues, the overtime prospect for Melanie is reduced considerably. Melanie's gross basic pay with a locality adjustment is $40,000. Melanie is paid bi-weekly and her gross monthly pay adjusted for 26 paychecks annually is $3,340. Her non-mandatory pay deductions are as follows:

| | |
|---|---:|
| Optional life insurance: | $ 12.00 |
| FSA medical reimbursement account: | 38.00 |
| TSP retirement savings: | 100.00 |
| Vision insurance | 26.00 |
| Charitable contribution: | 6.00 |
| Health insurance: | 300.00 |
| Union dues | 35.00 |
| Dental insurance | 64.00 |
| **Subtotal** | **$581.00** |

The balance of the deductions from Melanie's paycheck are:

| | |
|---|---:|
| TSP loan repayment | $215.00 |
| Medicare: | 61.00 |
| Federal income tax withholding | 114.00 |
| State income tax withholding | 91.00 |
| Non-Medicare Social Security Tax: | 260.00 |
| Mandatory FERS contribution | 27.00 |
| Non-optional FEGLI life insurance | 14.00 |
| **Subtotal** | **$ 782.00** |
| **Total expenses** | **$ 1,363.00** |
| **Net monthly income after payroll deductions:** | **$ 1,977.00** |

This calculation excludes overtime pay for Melanie. Further, the non-monthly expenses of life insurance ($12), TSP retirement ($100), charitable contribution ($6), and union dues ($35) could be added back to Melanie's net income, resulting in an adjusted net income of $2,124. Melanie's income tax withholdings are reasonable, although deletion of the TSP contribution will increase her income taxes. Health-related costs are allowable. The Court's calculation is based upon Melanie's pay stub dated August 24, 2013. At trial, George indicated that after being terminated by The Guidance Center, his income for the first eight months of 2013 was approximately $1,100. (Work-related expenses more than eradicated this income). He submits

- 6 -

15.02.19.A Johnson v ECMC Judgment Order.wpd

Case 11-06250    Doc# 63    Filed 02/19/15    Page 6 of 19

five to ten applications per month for new employment.  Although he was fully employed in the five years prior to his layoff, he now works on a part-time basis.  George's wages during 2011 when he worked at The Guidance Center, Inc., were $27,219.

Even though Melanie has worked overtime in the past, the prospect for future overtime is less tenable because of the federal government's sequestration and budget constraints for the V.A.  She did not receive a cost of living increase for the fiscal year 2013.  The Court is reticent to allocate additional income from overtime to Melanie.  Melanie is attempting to maximize her income by contributing tax-free dollars to a flexible spending account ("FSA") that will then reimburse Debtors, without penalty, for any actual medical expenses incurred.  Although voluntary, Melanie's monthly contribution to the FSA is a prudent means for maximizing disposable income.  Melanie's monthly net income would actually decrease were she to cease making contributions to the FSA because Debtors' ongoing medical expenses would then be paid from post-tax income.

The calculation of Melanie's pay is predicated on ECMC's Trial Exhibit L, Melanie Johnson's Dept. of Veterans Affairs pay stubs.  George's income for prior years is extrapolated from Trial Exhibit O (George Johnson's 2011 W-2 from The Guidance Center Inc.).  George's gross income for 2010 was $19,226.  (See Trial Exhibit M, George Johnson 2010 W-2 Firstline Transportation Security, Inc.)  The Commerce Bank account statements (Exhibit J) reflect net paycheck deposits for both George and Melanie.  The average monthly deposits for their combined pay is approximately $5,000 through October 2012.  Melanie's net pay deposits reflect overtime pay.  For the reasons indicated, the Court will not consider Melanie's overtime pay.

At the time of trial, Melanie's adjusted net income was $2,124 and despite his best efforts, George's income was $0.  When subtracted from this Court's estimated reasonable expenses of $3,921.84, the Debtors' available net monthly is negative $1,797.84.  This calculation does not include a deduction for payment of the second mortgage.

Debtors were married in 1999 and lived in California until 2007.  When both Debtors

were in California and were working, they made payments on their student loans for nine months for a total of $2,440. In 2008, Debtors moved to Kansas to help George's father, who had experienced a brain aneurysm. Debtors' total payments of $2,440 are approximately five percent of the total original student loan debts. Melanie was able to reduce the balance on her Perkins loan when she worked at a group home for three years. Debtors acknowledge that they have only made small payments on their student loan obligation. They explained that when they were both working and were financially capable of making payments, they did so. Otherwise, the student loan was either in a forbearance or in deferment, during which periods the Johnsons testified that they were unable to cash flow payments on their student loan. When the Debtors moved back to Kansas, they borrowed $10,000 from George's uncle to pay moving costs. Melanie also borrowed $2,500.00 from her TSP account to attempt to make ends meet during George's recent unemployment. Over the years of their marriage, the Debtors have experienced significant fluctuations in household income and have been able to minimally pay their non-student loan debts. The Debtors qualified for food stamps and the Debtors' children still qualify for free school lunches.

      Both Debtors benefitted from their post-secondary educations, which were funded in part by student loans. Melanie's education, although she was one class short of a biology degree, assisted with her procurement of her current employment with the V.A.

      Predicated on a hypothetical annual salary of $60,000 and their household size, it is Defendant's assertion that under income based repayment (IBR), the Debtors' payment on the student loan would be $234 per month paid over a 25-year period, with a potential for tax consequences associated with the cancellation of indebtedness, but with continuing certain rights such as deferment and forbearance. The Debtors were not aware of the IBR until two days prior to trial and had not applied to the program. The reality is that even if the Debtors' gross income were $60,000 per annum, providing for a family of five would be a Herculean task.

### Analysis

## A. Nondischarge of 523 Loan would impose an undue hardship under Title 11 U.S.C. § 523(a)(8).

The Tenth Circuit, in *In re Polleys*, adopted a version of what is commonly referred to as the "*Brunner* test," holding that in order to establish an undue hardship, a debtor must prove:

(1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans;

(2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and

(3) that the debtor has made good faith efforts to repay the loans.[3]

The court observed that "to better advance the Bankruptcy Code's 'fresh start' policy and to provide judges with the discretion to weigh all the relevant considerations, the terms of the test must be applied such that debtors who truly cannot afford to repay their loans may have their loans discharged."[4] In addition, the court directed that in applying the "good faith" portion of the test, bankruptcy courts "should consider whether the debtor is acting in good faith in seeking the discharge, or whether he is intentionally creating his hardship."[5]

When it enacted the student loan exception to discharge in the 1978 Act, "Congress was primarily concerned about abusive student debtors and protecting the solvency of student loan programs."[6] The exception to discharge was constructed because of a "rising incidence of consumer bankruptcies of former students motivated primarily to avoid payment of educational student loans."[7] Section 523(a)(8) was designed "[t]o remove the temptation of recent graduates

---

[3] *Educ. Credit Mgmt. Corp. v. Polleys* (*In re Polleys*), 356 F.3d 1302, 1309 (10th Cir. 2004).

[4] *Id.*

[5] *Id.*

[6] *Id.* at 1306. Until 2005, the exception to discharge did not apply to private student loans.

[7] *Id.* at 1306 (quoting REPORT OF THE COMM'N ON THE BANKR. LAWS OF THE UNITED STATES, H.R. DOC. NO. 93-137, pt. II § 4-506 (1973), reprinted in COLLIER ON BANKRUPTCY, App. Pt. 4(c) at 4-710 (15th ed. rev. 2003)). This concern seems misplaced since from 1969 to 1975 only three-tenths of one percent of the then-outstanding $7 billion of student loans had been discharged in bankruptcy. Janet Kosol, *Running the Gauntlet of "Undue Hardship"–The Discharge of Student Loans in Bankruptcy*, 11 GOLDEN GATE U.L. REV. 457, 462 (1981).

to use the bankruptcy system as a low-cost method of unencumbering future earnings."[8] The *Polleys* court adopted a less restrictive application of the *Brunner* test that does not require a debtor to demonstrate dire circumstance to discharge a student loan and commented, "[A]n overly restrictive interpretation of the *Brunner* test fails to further the Bankruptcy Code's goal of providing a 'fresh start' for the honest but unfortunate debtor."[9] The *Polleys* court refrained from adopting wholesale the "totality of the circumstances test" employed by the Eighth Circuit.[10] As noted above, the good faith portion of the *Brunner* framework requires the bankruptcy court to consider whether a debtor is acting in good faith if she seeks to discharge a student loan or whether she is intentionally creating her hardship.[11] Courts should not impose their own values on a debtor's life choices when considering good faith. Courts should also consider undue hardship within the context of economic realities faced by debtors.

The *Polleys* court's reticence to apply a strict interpretation to the *Brunner* test is well placed, and the *Brunner* framework has met with considerable criticism. *Brunner* was decided in 1987 when most private student loans were not excepted from discharge and government loans were subject to the undue hardship test only if a debtor filed her bankruptcy petition within five years of the start of the repayment period on a student loan. In *Brunner*, the debtor sought to discharge a student loan that was only one month into repayment status.

Exceptions to discharge are the products of public policy. The *Polleys* test applying § 523(a)(8) should not be applied in a vacuum and that court's more flexible application of the *Brunner* test reflects this public policy. The student loan exception to discharge in part was enacted in 1978 in response to highly publicized circumstances in which professionals, who

---

[8] *Polleys*, 356 F.3d at 1306.

[9] *Id.* at 1308.

[10] *Long v. Educ. Credit Mgmt. Corp. (In re Long)*, 322 F.3d 549, 554-55 (8th Cir. 2003).

[11] *Polleys*, 356 F.3d at 1309.

enjoyed a prospect for future increases in income, filed bankruptcy to discharge student loans soon after conclusion of their educations.[12] The result was § 523(a)(8) that provided if a debtor sought to discharge her government-affiliated student loan prior to the expiration of the five-year waiting period, then the loan could only be discharged under the undue hardship test.[13] Upon expiration of the five-year (and later the seven-year) waiting period, student loans were automatically dischargeable. The waiting periods were to prevent the abusive filing of graduates with high income potential who sought to discharge student loan debt soon after graduation; in order to discharge a student loan during the waiting period, these graduates would have to establish undue hardship under § 523(a)(8). In 1998, the seven-year waiting period for automatic discharge of a student loan was eliminated and in order to discharge a student loan in bankruptcy, a debtor had to establish undue hardship. In 2005, BAPCPA extended the exception to discharge of student loans to include all private student loans, not just those with some government connection.

The typical repayment term for student loans is ten years, which under the seven-year rule only extended for three years past the now-eliminated seven-year waiting period. Within an historical context, the *Brunner* framework is an unfortunate relic. The *Polleys* court shifted away from the strict reading and allowed a more realistic and considered application of the undue hardship standard with a partial embrace of the totality of the circumstances standard: hence, the Circuit's rejection of a test predicated on the certainty of hopelessness and the directive that this Court weigh all relevant considerations. The Tenth Circuit has further recognized that if only a portion of a student loan qualifies for discharge under the undue

---

[12] HENRY J. SOMMER, ET AL., NATIONAL CONSUMER LAW CENTER, CONSUMER BANKRUPTCY LAW AND PRACTICE § 15.4.3.8.1, at 495 (10th ed. 2012). A limited class of private student loans were also subject to § 523(a)(8).

[13] The five-year period was extended to seven years in 1990 and then eliminated entirely in 1999. Periods during which the loan repayment was suspended did not apply to the dischargeability waiting periods.

hardship standard, the bankruptcy court may enter a partial discharge accordingly.[14]

The student loan programs were indeed of noble birth--to provide citizens an opportunity to pursue post-secondary education and to better their economic circumstances. Since the inception of this virtuous experiment, our student loan debt has grown to unimaginable levels because of burgeoning education costs. Total student loan debt in the United States now exceeds $1.2 trillion - government loans account for 92 percent of this figure, private loans for the remaining 8 percent.[15] The burden of student loans delays marriage for graduates,[16] persists long after graduation,[17] widens the wealth gap in the United States,[18] is a drag on and harms the national economy, and stifles the housing market.[19] The burden of student loan debt is not restricted to recent graduates, but touches the lives of many older citizens,[20] and it is estimated that 17 percent of all adults owe student loans.[21] The student loan debt affects not only the

---

[14] *See Alderete v. ECMC, et al. (In re Alderete)*, 412 F.3d 1200 (10th Cir. 2005).

[15] AnnaMaria Andriotis and Alan Zibel, *Lenders Wince at CFPB's Voice*, WALL ST. J., Dec. 4, 2014, at C1.

[16] Rebecca Ungarino, *Burdened with Record Amount of Debt, Graduates Delay Marriage*, NBC NEWS, (Oct. 7, 2014), http://www.nbcnews.com/business/personal-finance/burdened-record-amount-debt-graduates-delay-marriage-n219371.

[17] Douglas Belkin, *College Loans Are a Burden Long After Graduation, Poll Finds*, WALL STREET JOURNAL ON-LINE (Aug. 7, 2014), https://www.lexis.com/research/retrieve?cc=&pushme=1&tmpFBSel=sel&totaldocs=&taggedDocs=8Z1%3A&toggleValue=&numDocsChked=1&prefFBSel=0&delformat=XCITE&fpDocs=&fpNodeId=&fpCiteReq=&expNewLead=id%3D%22expandedNewLead%22&brand=&dedupeOption=0&T1=1&_m=a097f07a3f841e875e3217968718fac3&docnum=1&_fmtstr=FULL&_startdoc=1&wchp=dGLzVzB-zSkAb&_md5=f692797662fc269c56164096ae7b21c6&focBudTerms=Douglas+Belkin&focBudSel=sel.

[18] Carolyn Thompson, *$1 trillion student loan debt widens US gap*, ASSOCIATED PRESS/CNBC NEWS (Mar. 27, 2014) http://www.cnbc.com/id/101531304#.

[19] Scott Stucky, *Burden of Student Loans Stifles the Housing Market*, AMERICAN BANKER (Mar. 24, 2014), https://www.lexis.com/research/retrieve?cc=&pushme=1&tmpFBSel=all&totaldocs=&taggedDocs=&toggleValue=&numDocsChked=0&prefFBSel=0&delformat=XCITE&fpDocs=&fpNodeId=&fpCiteReq=&expNewLead=id%3D%22expandedNewLead%22&brand=&dedupeOption=0&_m=3829bc224fce05b24150f0ef78ee6e53&docnum=1&_fmtstr=FULL&_startdoc=1&wchp=dGLbVzB-zSkAz&_md5=375b907cdd857124981a05d40c5a4cc0&focBudTerms=&focBudSel=all.

[20] Elizabeth Olsen, *Student Loan Debt Burdens More Than Just Young People*, CNBC.COM (Sept. 12, 2014) http://www.cnbc.com/id/101995544.

[21] *17 Percent of Adults Owe Student Loans*, CONSUMER BANKRUPTCY NEWS, Oct. 28, 2013, at 4.

- 12 -
15.02.19.A Johnson v ECMC Judgment Order.wpd

students, but also their parents.[22] Indeed, student loan debt adversely affects the psychological health of students and graduates.[23]

Considering a significant shift of the skyrocketing costs of college education to the middle class over the last three decades,[24] it is disconsonant with public policy and bankruptcy's fresh start to leave debtors in virtual lifetime servitude to student loans. It is doubtful that Congress intended to leave the courts so constrained or the student borrowers so burdened, and neither the purpose nor the text of § 523(a)(8) demand such an outcome.

In a recent and well-considered article, the authors observe that because of the crush of student loan debts:

> . . .a substantial percentage of Americans may not be able to buy homes and automobiles, start businesses, invest in capital ventures, educate their children, or save for a secure and dignified retirement because they are overly burdened with debt incurred in completing their postsecondary educations.[25]

The authors review the history of the federal government involvement in student loan programs and current status of the student loan debt, including its treatment in bankruptcy proceedings. Of particular concern is that "for-profit institutions represented only eleven percent of all higher education students, but they accounted for twenty-six percent of all student loans and forty-three percent of student-loan defaulters."[26] Also of note are that two-thirds of all college or university students borrow money to pay for tuition and costs, the current student loan debt trails only

---

[22] Jeanie Ahn, *Parents pay the price for children's student debt*, YAHOO FINANCE (Oct. 17, 2014), http://finance.yahoo.com/news/student-loans-drowning-parents-125503328.html;_ylt=AwrTWfxgONpUkUgAfEmTmYlQ.

[23] Katrina M. Walsemann, Gilbert C. Gee, and Danielle Gentile, *Sick of our loans: Student borrowing and the mental health of young adults in the United States,* 124 SOCIAL SCIENCE & MEDICINE 85 (January 2015) http://www.sciencedirect.com/science/article/pii/S0277953614007503.

[24] Adjusted for inflation, the cost to attend a four-year public university has increased by 331 percent since 1983. (Source: College Board (2013). *Trends in College Pricing 2013*.)

[25] Robert C. Cloud and Richard Fossey, *Facing the Student-Debt Crisis: Restoring the Integrity of the Federal Student Loan Program*, 40 J.C. & U.L. 467, 495 (2014), citing to Jayne O'Donnell, *Consumer Protection Chief Talks About Student Loans*, USA TODAY, Aug. 15, 2013, at 3B.

[26] Robert C. Cloud and Richard Fossey, supra note 25, 40 J.C. & U.L. at 487.

home mortgage debt in amount, and student loan debt has tripled between 2004 and 2012.[27] Tuition has risen "27 percent at public colleges and 14 percent at private schools in the past five years . . . ."[28] Many college students find themselves in such dire financial straits that food pantries have become a common sight on campus.[29]

### 1. Debtors cannot maintain, based on their current income and expenses, a "minimal" standard of living for themselves if forced to repay their § 523(a)(8) Loan obligation.

Under the first element of the *Brunner* test, a debtor must show that she cannot maintain, based on her current income and expenses, a "minimal" standard of living if forced to repay her student loan debt.[30] The record establishes that Debtors barely maintain a minimal standard of living, even without paying the Loan.

Taking the budget as a whole, none of Debtors' projected expenses are unreasonably high. In fact, they are too low. For instance, monthly maintenance costs for a home well exceed the $100 that the Debtors budgeted. The Debtors drive two automobiles that in the aggregate are 40 years old. Debtors' projected monthly car payment and monthly auto repair expense are unrealistically low for automobiles that are driven daily. The Debtors' projected expense for gasoline consumption is inadequate.

Noticeably absent from the record is how Debtors pay for the day-to-day costs to maintain a household, as well as unexpected expenses that occur over time, *e.g.*, disruption of income, illness, costs of replacing an automobile, and unforeseen medical expenses. It is likely that instead of anticipating and paying such miscellaneous expenses as they arise, the Debtors

---

[27] Robert C. Cloud and Richard Fossey, *supra* note 25, 40 J.C. & U.L. at 493.

[28] Frank Eltman, *Food Pantries on the Rise at U.S. College Campuses*, ASSOCIATED PRESS (March 19, 2014, http://diverseeducation.com/article/61283/?utm_campaign=Diverse%20Newsletter%203&utm_medium=email&utm_source=Eloqua&elq=97ed4a9be13746568b0af0a80cb7ba2b&elqCampaignId=173.

[29] Frank Eltman, *supra* note 28.

[30] *Polleys*, 356 F.2d at 1307.

15.02.19.A Johnson v ECMC Judgment Order.wpd

will be forced to incur debt or to borrow from their retirement accounts.

Defense counsel argues that Debtors have a few voluntary expenses that appear unnecessary for them to maintain a "minimal" standard of living. Namely, Melanie currently contributes monthly towards an FSA, as discussed *supra*. In addition, Melanie pays $35 monthly for union dues, $100 monthly toward saving for retirement, and $215 monthly toward two loans against her retirement savings. Defense counsel argues that because the aforementioned expenses are both voluntary and unnecessary, Debtors should instead be forced to contribute these payments toward their student loans. This Court disagrees.

As discussed *supra*, even if Melanie discontinues her contributions toward the FSA, Debtors' ongoing health expenses are not likely to diminish and, accordingly, their monthly disposable income, if any, will decrease because of the associated tax consequences. The Debtors prudently have health and dental insurance. The union dues, retirement contributions, and loan repayment pose a more intriguing question: Can voluntary expenses that do not immediately affect a debtor's standard of living nevertheless be necessary to maintain a "minimal" standard of living if the payments thereon were instead applied to repay a student loan? Under the appropriate circumstances, the answer is yes. This Court's experience suggests that many debtors actually understate expenses and that in reality it is impossible to forecast unavoidable but significant expenses. The Debtors are no different as their budget provides meager allowances for essentials and is devoid of a monetary contingency for unexpected events, such as might involve the Debtors' home or their three minor children, the latter of whom will have higher costs as they grow older. If Melanie stops repaying the TSP loan, there are negative tax consequences and penalties.

The Court takes judicial notice of the Great Recession and the lumbering recovery of the United States' economy and slow growth since 2008. Debtors' projected expenses make no provision for the unexpected yet inevitable occurrences, in particular those associated with raising three young children. While such unexpected events impose additional hardship on any

- 15 -

15.02.19.A Johnson v ECMC Judgment Order.wpd

debtor, the resulting hardship on these Debtors would be undue because they would be incapable of affording essential expenses and deprived of the ability to maintain a minimal lifestyle if forced to repay the Loan.

Although it is a debtor's obligation to accurately complete his or her schedules, it is within the province of this Court to account for over- and understatements of scheduled expenses within the totality of the circumstances. In this case, the reality is that Debtors will either have to redirect their seemingly "unnecessary" expenditures toward inevitable life expenses as they occur, *e.g.*, the higher than projected costs of auto repairs/replacement, unexpected healthcare costs, home maintenance costs, food and sundry costs, and miscellaneous needs of everyday life, or they will have to incur debt by using credit cards or by borrowing against the minimal retirement savings Melanie has accumulated, which will, in turn, increase monthly expenses. However, the loan payment of $100 per month to George's uncle should be deleted, which does reduce Debtors' listed expenses to $3,921.84.

Although the Court finds Debtors' expenditures toward retirement will inevitably be redirected to maintain their minimal standard of living,[31] to otherwise inhibit their ability to contribute reasonable funds to a retirement plan contradicts the public policy reflected in the Congressional encouragement of self-sustained retirement and, further, would improperly penalize an individual who must either self-fund her own retirement or place her future in the hands of a social welfare system regularly criticized for its inadequacy. This Court must follow the Tenth Circuit's directive "that debtors who truly cannot afford to repay their loans may have their loans discharged."[32] These Debtors truly cannot afford to repay the Loan.

> **2. Additional circumstances exist indicating that Debtors' state of affairs is likely to persist for a significant portion of the repayment period of the student loans.**

---

[31] Melanie was forced to borrow from her TSP federal retirement account to "make ends meet."

[32] *Polleys*, 356 F.3d at 1309.

- 16 -

15.02.19.A Johnson v ECMC Judgment Order.wpd

Case 11-06250    Doc# 63    Filed 02/19/15    Page 16 of 19

When applying the second *Brunner* element, the Tenth Circuit observed:

[C]ourts need not require a "certainty of hopelessness." Instead, a realistic look must be made into debtor's circumstances and the debtor's ability to provide for adequate shelter, nutrition, health care, and the like. Importantly, "courts should base their estimation of a debtor's prospects on specific articulable facts, not unfounded optimism," and the inquiry into future circumstances should be limited to the foreseeable future, at most over the term of the loan.[33]

Debtors' expenses seem unreasonably low, and any significant reduction in their living expenses would most likely be offset by future expenses. This Court agrees with Judge Karlin who, in *In re Quarles*,[34] observed that even where a car might soon be paid off, "to completely deduct that payment from the Debtor's monthly expenses ignores the fact that the nine year old car will almost certainly need to be replaced at some point in the near future."[35] In addition, as cars grow older, "there will likely be an increase in maintenance costs for the aging car until it is replaced."[36] As noted *supra*, because Debtors' projected monthly expenses for car payments, for maintenance, and for gasoline are unrealistically low, an increase in Debtors' monthly expenditures is appropriate. Based on their income history and increasing costs of their family, this state of affairs is likely to persist for a significant portion of the Loan's repayment period.

Absent refinancing or, in the alternative, a program for repayment, the standard student loan repayment term is ten years. It might be argued that since the ten years has expired with respect to repayment of the Loan, this repayment period factor does not apply and any proposed total repayment plan should not exceed ten years. This observation is sound because at the time *Brunner* was decided, student loans that had been in a repayment period for a more than five years were dischargeable and, by extension, all student loans for which debtors sought discharge

---

[33] *Polleys*, 356 F.3d 1310 (citation omitted).

[34] *Quarles v. Education Credit Management Corporation (In re Quarles)*, No. 02-7089, 2004 WL 2191608, at * 7 (Bankr. D. Kan. April 22, 2004) (agreeing with Judge Pusateri's decision in *Innes v. State of Kansas, et al. (In re Innes)*, Adv. No. 95-7104 at 12 (Bankr. D. Kan. Dec. 22, 2000)).

[35] *Quarles*, 2004 WL 2191608, at * 7.

[36] *Id.*

- 17 -
15.02.19.A Johnson v ECMC Judgment Order.wpd

Case 11-06250   Doc# 63   Filed 02/19/15   Page 17 of 19

under undue hardship had to be in the ten-year repayment period. Of equal or greater force is that *Brunner* was decided at the time that all student loans were eventually dischargeable, subject to the five-year test. The *Brunner* test was developed when there were means other than undue hardship to discharge student loans under the Code.

### 3. Debtors have made good faith efforts to repay their student loans.

The Tenth Circuit directed that a court's inquiry into the third *Brunner* element, a debtor's good faith, "should focus on questions surrounding the legitimacy of the basis for seeking a discharge."[37] "[T]he failure to make a payment, standing alone, does not establish a lack of good faith."[38] However, "a debtor who willfully contrives a hardship in order to discharge student loans should be deemed to be acting in bad faith."[39] While participation in a repayment program is not required to establish good faith, weight should be given to the steps a debtor takes prior to filing for bankruptcy in determining whether the debtor is acting in good faith.[40] In *Polleys*, the Tenth Circuit held that "the debtor's efforts to cooperate with her lenders show that she was acting in good faith in working out a repayment plan."[41]

Debtors' efforts to cooperate with the lenders is indicia of their good faith. Evidence admitted at trial by stipulation, although unnecessary to this Court's conclusion, shows that the Debtors cooperated with the student loan creditors.

Finally, there is no indication that Debtors are "attempting to abuse the student loan system by having [their] loans forgiven before embarking on lucrative careers in the private

---

[37] *Polleys*, 356 F.3d at 1310.

[38] *Id.* at 1311 (citing *In re Coats*, 214 B.R. 397, 405 (Bankr. N.D. Okla. 1997)).

[39] *In re Alderete*, 412 F.3d 1200, 1206 (10th Cir. 2005).

[40] *Id.*

[41] *Id.* (citing *Polleys*, 356 F.3d at 1312).

sector."[42]  There is also no evidence that Debtors could have otherwise increased their earning potential.  The evidence before the Court, including Debtors' credible testimony, is that Debtors have maximized their earning potential.

Given the facts of this case, the Court finds that Debtors' small voluntary payments toward their loans, the consolidation of those loans, and the Debtors' efforts to stay in contact with the student loan creditor establishes that they were acting in good faith.  Because Debtors have shown that they have made good faith efforts to maximize earning potential and minimize expenses, the Court finds that Debtors have made a good faith effort to repay their student loans.  Both Debtors testified at trial that they wish they could pay the Loan, and they impressed this Court as honest and hardworking individuals doing their best to provide for their family and to contribute to society.  The Debtors seek discharge of the Loan in good faith.

## Conclusion

The Court finds that repayment of Debtors' Loan would constitute an undue hardship under § 523(a)(8) on the Debtors and the Debtors' dependents.  Debtors cannot afford to repay any of the Loan while maintaining a minimal standard of living.  Debtors' current financial inability to repay their student loans is likely to continue throughout any repayment period.  Debtors have demonstrated good faith by making voluntary payments toward the Loan.  Having satisfied each part of the *Brunner* test, Debtors are entitled to discharge the Loan.  A separate judgment consistent with this Memorandum Opinion will be entered this day.

IT IS SO ORDERED.

###

ROBERT D. BERGER
U.S. BANKRUPTCY JUDGE
DISTRICT OF KANSAS

---

[42] *Polleys*, 356 F.3d at 1312 (citing *In re Cheesman*, 25 F.3d 356 (6th Cir. 1994)).