The relief described hereinbelow is SO ORDERED.

SIGNED this 4th day of December, 2017.



_____
Robert D. Berger
United States Bankruptcy Judge

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

In re:

George A. Johnson
Melanie Raney-Johnson,

    Debtors.

Case No. 11-23108
Chapter 7

George A. Johnson and
Melanie Raney-Johnson,
    Plaintiffs,

    v.

Sallie Mae, Inc., and
Educational Credit Management
Corporation,
    Defendants.

Adv. No. 11-6250

**Memorandum Opinion and Order**
**Denying Discharge of Debtors' Student Loan Debt under 11 U.S.C. § 523(a)(8)**

    The Court is intimately familiar with the minute details of Debtors George Johnson and

Melanie Raney-Johnson's financial life, as it has now conducted two trials on whether Debtors'

sizeable student loan debt is eligible for discharge under 11 U.S.C. § 523(a)(8)[1] as an undue hardship. After the first trial, the Court discharged Debtors' student loan debt based on findings that Debtors were not then able to maintain a minimal standard of living, additional circumstances existed that indicated that inability was likely to persist for a significant portion of the repayment period, and Debtors had made a good faith effort to repay their student loans. Debtors' student loan creditor appealed that decision, and the appellate court vacated this Court's order and judgment, and remanded the case for further proceedings.

The Court has now held a second trial, focusing specifically on Debtors' potential earning capacity, the term of repayment of Debtors' loan, and the repayment options available to Debtors to restructure their student loan debt. The Court is happy to report that Debtors' earning capacity has significantly improved for the better, and that both the terms of repayment and restructuring options for Debtors' student loan have also improved, and therefore concludes that Debtors' student loan debt does not qualify for an undue hardship discharge under § 523(a)(8). The Court therefore denies judgment to Debtors on their § 523(a)(8) claim.

I.      **Background and Findings of Fact**

Debtors filed their pro se Chapter 7 bankruptcy petition more than 6 years ago. At about the same time, they also filed a pro se adversary proceeding seeking discharge of their student loan obligations.[2]

---

[1] All future statutory references are to the Bankruptcy Code, as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, 11 U.S.C. §§ 101-1532, unless otherwise specifically noted.

[2] An order was entered granting Debtors a general discharge under § 727 in February 2012.

Creditor Educational Credit Management Corporation ("ECMC") was substituted as the correct party in Debtors' adversary case, and after the appropriate discovery was undertaken, the Court held a trial of the matter in September 2013. The Court made multiple pertinent findings of fact:

- The balance due at the time of the first trial on Debtors' joint spousal consolidation student loan was approximately $83,000, and Debtors did not contest that their loan fell within § 523(a)(8). The original amounts were borrowed in the 1990s ($25,000 for George and $20,000 for Melanie), and were consolidated in 2005.
- Both Debtors were in their upper 30s, and had 3 children in the home. No member of the household suffered from any mental or physical disabilities, although one daughter had recently received orthodontia.
- Debtors were paying $1320 per month on their home mortgage. Debtors' monthly expenses at the time of trial totaled $4021.84 per month, and also included about $382 for home maintenance and utilities, $200 for television and internet, $400 for transportation, $171 for auto and health insurance and medicine, $725 for groceries and eating out, $300 for laundry and clothing, $200 recreation, $150 for childcare, and a $100 personal loan to Debtors' family member.
- At the time of trial, George had recently been laid off and was earning only limited income from substitute teaching, coaching, and refereeing. Melanie was netting $1977 per month from her employment at the Department of Veterans Affairs, excluding overtime, where she was paid at the GS-7, Step 2 pay level. Melanie's overtime prospects were limited in her position.
- Debtors owned a 2000 GMC Sierra and a 1998 Volvo, valued at $2500 and $1500, respectively.
- Debtors had made only small payments on their consolidated student loan, but had paid at times when they had been financially able. ECMC asserted that Debtors were eligible for the Income Based Repayment Program ("IBR"), with a monthly payment of $224 over a 25-year period, "with a potential for tax consequences associated with the cancellation of indebtedness, but with continuing certain rights such as deferment and forbearance."[3] Debtors had not been aware of the IBR until two days prior to trial, and had not applied to the program.

Based on those findings of fact, the Court made the following Conclusions of Law:

---

[3] *Johnson v. Sallie Mae, Inc. (In re Johnson)*, No. 11-23108, 2015 WL 795830, at *5 (Bankr. D. Kan. Feb. 19, 2015), *vacated and remanded by Johnson v. Educ. Credit Mgmt. Corp. (In re Johnson)*, No. 15-2631-JAR, 2016 WL 827752 (D. Kan. Mar. 2, 2016).

- Debtors barely maintained a minimal standard of living, even without paying their student loan. Debtors' budgeted expenses for home maintenance and gasoline were too low, and Debtors' two automobiles were aging and would need either maintenance or replacement. Debtors' meager allowances for things like union dues, retirement savings, and loan repayment were inconsequential in light of the likely unavoidable yet significant expenses not budgeted for, although the $100 loan repayment to Debtors' family member should be removed from Debtors' monthly expenses, changing those to $3921.84.
- Based on Debtors' income/earning history and the increasing costs of Debtors' family, their current state of financial affairs was likely to persist for a significant portion of the repayment period.
- Debtors had cooperated with their student loan creditors over the years and had made small voluntary payments, there was no evidence of abuse, and no evidence that Debtors could have increased their earning potential (rather, Debtors had maximized their earning potential).

The Court then entered judgment for Debtors, finding Debtors' consolidated student loan should be discharged as an undue hardship under § 523(a)(8). ECMC appealed the decision to the District Court.

On appellate review, the District Court vacated this Court's judgment and remanded Debtors' case. The District Court concurred that Debtors were not able to currently maintain a minimal standard of living, because George had been laid off from his employment and "was bringing in next to no income to support the family" and, therefore, Debtors' budget "was significantly in the red."[4] Regarding whether these circumstances would persist in the future, the District Court found that this Court had not considered whether George's unemployment was likely to persist, and had not computed the accurate repayment period. And finally, regarding Debtors' good faith, the District Court determined that the record indicated Debtors' repayment under the IBR without considering George's unemployment, and therefore remanded for "further

---

[4] *Johnson v. Educ. Credit Mgmt. Corp. (In re Johnson)*, No. 15-2631-JAR, 2016 WL 827752, at *4 (D. Kan. Mar. 2, 2016).

consideration and clarification of the impact of the IBR."[5]

Upon remand, the parties again undertook discovery. The Court held a second trial in August 2017. At the second trial, the Court learned that Debtors' income had increased fairly significantly: Melanie was now a billing supervisor with the same employer and received an hourly pay rate that had doubled since the first trial and a net income of $3640.43 per month. George had also been hired at the Department of Veterans Affairs as a biller where he had worked for the last 2 years and 3 months. Debtors' combined net income was now $6189.64 per month and had been stable for some time.[6]

Melanie testified that the family's expenses had also increased, however, to a total of $6234 per month, leaving them with a negative balance of $44.36 each month.[7] Debtors' reported expenses are as follows:

| Home rental and insurance | $1130 |
| Utilities (electricity, heat, water, sewer, trash) | $281 |
| Telephone, internet, cable | $404 |

---

[5] *Id.* at *6.

[6] The net income of $6189.64 per month is what was reported by Debtors on an Amended Schedule I filed as part of Debtors' exhibits. Debtors testified that based on their recent pay stubs—that included overtime—they may net as much as $6845 per month. Debtors future overtime prospects are not certain, however. And based on Debtors' 2016 bank statements, they deposited about $7321 per month in 2016, although those numbers include a tax refund and gross earnings from George's refereeing and DJ-ing, without the accompanying expense deductions. On the other hand, Debtors' tax returns for 2016 show an adjusted gross income of $68,377, which would be a gross of only $5698.03 a month. Regardless, Debtors admit that their combined net monthly income has increased by about $2000 per month, an increase of about 46%.

[7] Debtors monthly expenses increased by about the same amount and percentage as their income, by about $2000, or about 50%.

Case 11-06250    Doc# 114    Filed 12/04/17    Page 5 of 18

| Food and housekeeping | $800 |
|---|---|
| Childcare and children's education | $100 |
| Clothing and laundry | $300 |
| Personal care products and services | $150 |
| Medical/Dental expenses | $333 |
| Transportation | $600 |
| Recreation | $300 |
| Vehicle insurance | $290 |
| Taxes | $405 |
| Vehicle installment payments | $1141 |

Debtors currently rent an older four bedroom, two and a half bathroom home, that Melanie described as "not extravagant," and Debtors' housing expense has decreased since the first trial. Regarding Debtors' high vehicle installment payments of $1141 per month, as Debtors' children have grown they have become more involved in sports, and Debtors purchased their daughter a used vehicle and also added their daughter to their vehicle insurance. As a result, Debtors currently own three vehicles: a 2006 GMC Yukon Denali (with monthly payments of $272.32 for the next 68 months) that George drives, a 2015 Chevy Cruze (with payments of $445 for the next 47 months) that Melanie drives, and a 2005 Acura MDX (with payments of $255.93 for the next 45 months) that Debtors' daughter drives. They are also paying a deficiency from a prior vehicle, with payments of $150 for the next 36 months.

Debtors' pay for five cell phones for their family each month, which Debtors feel is necessary because they do not have a land line and their children each "need" a phone for their parents to communicate with them. Melanie testified that she expects Debtors, starting in about 2 years, to have increased expenses relating to their children's college education for the next 12

years thereafter. Debtors' children are currently 16, 14, and 10, and Debtors expect to need to pay more for their children's education because of Debtors' self-described "middle income" status. Debtors intend to contribute money directly to their children's college education, although they understand their children will need to work and apply for scholarships and grants as well.

Debtors also testified about needed revisions to their Schedule J. Debtors' medical and dental expenses of $333 per month should be reduced to about $50 per month, because Debtors actually use their health savings account for most of those expenses which is already a reduction to their income, and only spend about $50 a month on top of that. In addition, Debtors' tax payments will be resolved and paid off in full in only 4 months, returning $405 to their monthly budget.

Melanie testified that her potential for a promotion at work was limited, simply because she was already a supervisor at the GS-11 level, so there were few advancement opportunities beyond that in her department. Melanie would not be eligible to apply for an advancement for about a half of a year, but the positions rarely become available. George was hired a little more than 2 years previously in the same department, but he is currently a GS-6 and has little opportunity for advancement due to his status compared to those with far higher tenure, beyond general step increases based on years of service. Debtors have about $25,000 saved for retirement through their employer's thrift savings plan. Melanie contributes about $50 per month, and George contributes about $32 per month.

Melanie testified that Debtors have always been in contact with their student loan lenders. When they consolidated their loans in 2005, Debtors owed about $63,000, with an APR

of 4.5%. Debtors have paid only $2440 since that time, and nothing since the first trial. Melanie testified that Debtors have tried to minimize expenses through coupons and limited expenditures on shoes and clothing. On the other hand, however, Debtors admit they spend money each month (estimated at $300 a month) on sports and athletic events for their children, which they believe is necessary to maintain a minimal standard of living.

The current balance on Debtors' consolidated student loan is $93,599.10, with a 30 year repayment plan.[8] Melanie testified that she did not believe an income contingent payment plan was appropriate for Debtors, regardless of whether it was the IBR or the newer Revised Pay As You Earn Plan ("REPAYE"), because Debtors would probably have a large tax bill at the end of the 20 year repayment term associated with those plans when they would be at or near retirement age. Debtors are currently in their 40s, as George is 43 and Melanie is 41 years old. Debtors monthly payments based on their current household size and income would be $315.09 per month under the IBR and $210.06 per month under REPAYE.

## II. Analysis

A proceeding to determine the dischargeability of particular debts is a core proceeding under 28 U.S.C. § 157(b)(2)(I), over which this Court may exercise subject matter jurisdiction.[9]

### A. Legal Standards

With certain exceptions, the Bankruptcy Code provides debtors with a "fresh start" by eliminating or restructuring their debts. One such exception to a "fresh start" is § 523(a)(8)'s presumption that student loans are non-dischargeable in the absence of a showing of undue

---

[8] From April 2006 to June 2011, Debtors were in a forbearance or deferment period on their loan, and that time period, therefore, does not count toward the 30 year repayment.

[9] 28 U.S.C. § 157(b)(1) and § 1334(b).

-8-

hardship on the debtor or her dependents.[10] A debtor has the burden to prove that his or her student loan should be discharged.[9]

To determine what constitutes "undue hardship," the Tenth Circuit has joined several other circuit courts in adopting the tree-part test set forth in *Brunner v. New York State of Higher Education Services*:

> (1) That the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student

---

[10] Debtors briefly discussed at trial their use of their original loans when they received them in the 1990s. Melanie testified that of the $20,000 loan she received, probably about a third of the loan was used for tuition, but that the remainder was used for general living expenses such as her vehicle payment and vehicle insurance. George testified, however, that the entirety of his student loan went toward payment of tuition. Although there is currently some debate about what constitutes an educational loan generally under § 523(a)(8)(A) and (B), *see Kashikar v. Turnstile Cap. Mgmt., LLC (In re Kashikar)*, 567 B.R. 160, 165–67 (B.A.P. 9th Cir. 2017) (describing the four types of "educational claims" excepted from discharge under § 523(a)(8) and dissecting the term "educational benefit"), it is generally accepted that the focus is not on how the funds were used "but on the stated purpose for the loan when it was made." *Rizor v. Acapita Educ. Fin. Corp. (In re Rizor)*, 553 B.R. 144, 149–50 (D. Alaska 2016) ("Most courts say the question of whether a loan is for an educational benefit depends not how the funds were actually used, but on the stated purpose for the loan when it was obtained. A loan as used in § 523(a)(8)(i) makes no distinction between those used for tuition and those used for other expenses. The actual use of the loan proceeds is immaterial. Where the loan documents, as here, establish they were premised on the debtor's status as a student and were for educational purposes, they qualify under
§ 523(a)(8)(A)(i)." (internal citations and quotations omitted)).

Regardless, the issue was not raised by any party in either the complaint or the amended pretrial order, and the Court noted in its prior Opinion that Debtors did not contest that their loan "falls within the ambit of § 523(a)(8)." *Johnson v. Sallie Mae, Inc. (In re Johnson)*, No. 11-23108, 2015 WL 795830, at *1 (Bankr. D. Kan. Feb. 19, 2015), *vacated and remanded by Johnson v. Educ. Credit Mgmt. Corp. (In re Johnson)*, No. 15-2631-JAR, 2016 WL 827752 (D. Kan. Mar. 2, 2016). The Court will not, therefore, raise the matter on its own motion.

[9] *In re Lindberg*, 170 B.R. 462 (Bankr. D. Kan. 1994).

-9-

Case 11-06250    Doc# 114    Filed 12/04/17    Page 9 of 18

loans; and (3) that the debtor has made good faith efforts to repay the loans.[10]

The debtor must prove all three *Brunner* elements by a preponderance of the evidence to be entitled to a discharge.[11] In other words, if the court finds the debtor has failed to prove any of these three elements, the student loan is not dischargeable.[12] That said, the Tenth Circuit "makes it clear that it disdains 'overly restrictive' interpretations of this test, and concludes that it should be applied to 'further the Bankruptcy Code's goal of providing a 'fresh start' to the honest but unfortunate debtor[.]'"[13] Moreover, the Tenth Circuit directs that the *Brunner* test does not "rule out consideration of all the facts and circumstances" surrounding the case, and it should be applied in such a manner "such that debtors who truly cannot afford to repay their loans may have their loans discharged."[14]

### B. Application of the *Brunner* Test Post Remand

#### 1. Debtors' Ability to Pay

Under the first prong of *Brunner*, the Court must "evaluate the debtor's current financial situation" and "take into consideration whether the debtor has demonstrated any reason why he or she is unable to earn sufficient income to maintain him/herself and dependents while repaying the student loan debt."[15] A debtor must demonstrate "more than simply tight finances," though

---

[10] *Educ. Credit Mgmt. Corp. v. Polleys (In re Polleys)*, 356 F.3d 1302, 1307 (10th Cir. 2004) (quoting *Brunner*, 831 F.2d 395, 396 (2d Cir. 1987)).
[11] *Id.*
[12] *Id.*
[13] *Alderete v. Educ. Credit Mgmt. Corp. (In re Alderete)*, 308 B.R. 495, 503 (B.A.P. 10th Cir. 2004).
[14] *Polleys*, 356 F.3d at 1308–09.
[15] *Alderete*, 308 B.R. at 503.

not "utter hopelessness."[16] The Court should not impose a "spartan life on family members who do not personally owe the underlying student loan, particularly when those family members are children."[17] Instead, "[a] minimal standard of living includes what is minimally necessary to see that the needs of the debtor and [his] dependents are met for care, including food, shelter, clothing, and medical treatment."[18]

Debtors' income has increased substantially since the Court first reviewed Debtors' financial picture. At the time of the first trial in this case, only Melanie was working, and she was netting only $1977 a month. Time has drastically changed Debtors' situation, however, and for the better. Melanie is now earning about double her hourly wage, and netting, in her estimation, $3640.43 per month. George has been employed with the same employer for more than two years, giving the Court confidence in his job stability and security. Debtors no longer have a negative or volatile income history, but both have stable, good-paying jobs. Combined, Debtors report a monthly net income of $6189.64.[19]

Debtors have increased their expenses along with their income, but the Court cannot say that Debtors would be unable to support themselves and repay their student loan. As people do,

---

[16] *See Buckland v. Educ. Credit Mgmt. Corp. (In re Buckland)*, 424 B.R. 883, 889 (Bankr. D. Kan. 2010) (quoting *Innes v. Kansas (In re Innes)*, 284 B.R. 496, 504 (D. Kan. 2002)).

[17] *Id*. (quoting *Windland v. United States Dep't of Educ. (In re Windland)*, 201 B.R. 178, 182-83 (Bankr. N.D. Ohio 1996)).

[18] *Id.* (quoting *In re Innes*, 284 B.R. at 504).

[19] Debtors' report a gross monthly income of $8179.60, yielding a gross annual income of $98,155.20. This is actually higher than the median family income data provided by the Justice Department for a family of five in Kansas, which the U.S. Trustee estimates to be $84,117. *See* https://www.justice.gov/ust/eo/bapcpa/20150401/bci_data/median_income_table.htm (using data for a family of four in Kansas and adding as directed for the additional family member). Debtors' income is also significantly higher than the cut off for food stamps in Kansas ($37,416, per https://www.fns.usda.gov/snap/eligibility#Income), and Debtors are now firmly middle class according to the Pew Research Center, http://www.pewresearch.org/fact-tank/2016/05/11/ are-you-in-the-american-middle-class/.

Debtors have filled their lives with things they think they need: cell phones, three vehicles, sports activities for their children, etc. And the Court is sympathetic to the plight of parents with three teens or near-teens, who feel they need to keep up with their peers. But the test the Court has been tasked with applying asks whether Debtors could make payments on their student loan and maintain a *minimal* standard of living.[20] Debtors could easily do so.

But even without an imposed austerity, Debtors admit to having overstated their monthly medical and dental expenses (stated at $333 a month but should have been only about $50 a month), freeing up about $283 a month in their budget. That amount is more than what is needed to make a monthly payment under the REPAYE program of $210.06. Debtors are saving a small amount for retirement each month. Debtors have one vehicle that is only a couple of years old, and although their other two vehicles are older, there was no testimony that they were unreliable. In addition, Debtors at the time of trial had only 4 months left of payments on their tax debt, freeing up another $405 each month to make a student loan payment. The bottom line is that Debtors are currently in a pretty good place financially.

Debtors simply have not met their burden to show that they are "unable to earn sufficient income to maintain [themselves] and dependents while repaying the student loan debt."[21] Debtors therefore fail to meet the first prong of the *Brunner* test.

   **2.   Additional Circumstances**

---

[20] *See Azwar v. Texas Guaranteed Student Loan Corp. (In re Azwar)*, 326 B.R. 165, 175 (B.A.P. 10th Cir. 2005) (calling undue hardship "more than simply a reduced standard of living" (internal quotation omitted)); *Garrett v. NEBHELP, Inc. (In re Garrett)*, No. WO-02-027, 2002 WL 1926153, at *3 (B.A.P. 10th Cir. 2002) (stating that bankruptcy court did not err in its conclusion that expenses "for cell phones and martial arts training were unnecessary"); *Innes*, 284 B.R. at 504 (calling a "minimal standard of living," "living within the strictures of a frugal budget in the forseeable future" (internal quotations omitted)).

[21] *Alderete*, 308 B.R. at 503.

The second prong of the *Brunner* test, which requires that additional circumstances exist indicating that Debtors will be unable to repay the loans while maintaining a minimal standard of living for a significant portion of the repayment period, "properly recognizes that a student loan is viewed as a mortgage on the debtor's future."[21] However, there need not be a "certainty of hopelessness."[22] Instead, the Court must take a realistic future look into a debtor's exceptional circumstances and ability to "provide for adequate shelter, nutrition, health care, and the like."[23] Exceptional circumstances include illness, recent disability, or an exceptionally large number of dependents that would hamper a debtor's ability to repay the student loan.[24]

Debtors credibly testified that they should expect minimal overtime and that neither of them had good opportunities for career advancement, other than general salary step increases built into the federal salary structure and cost of living increases. As a result, Debtors' current financial situation will probably persist. But as the Court just noted, however, Debtors' current financial situation is not dire, and there is ample room in Debtors' budget for a monthly student loan payment.

In addition, the only additional circumstances raised by Debtors is the prospect of college for their children beginning in a couple of years. But Debtors' children's reasonable education expenses, if incurred, will be so variable depending on myriad facts unknown, that the Court finds it difficult to assess them.[25] First, the Court presumes that certain other budget items in

---

[21] *Polleys*, 356 F.3d at 1310 (internal quotations omitted).
[22] *Id.*
[23] *Id.*
[24] *Alderete*, 412 F.3d at 1205.
[25] *See Murray v. ECMC (In re Murray)*, 563 B.R. 52, 61 (Bankr. D. Kan. 2016) ("In applying this prong, a court must make a realistic look into debtor's circumstances and base its estimation of a debtor's prospects on specific articulable facts, not unfounded optimism." (internal quotations and alterations omitted)). Obviously, when Debtors consolidated their student loans in 2005, they knew their projected ages and the likely educational needs of their

-13-

Debtors' budget will also shift at the same time. Debtors would no longer be paying for sports activities for a child in college and Debtors will cease paying the deficiency sum in their vehicle expense in 3 years.[26] In addition, Debtors acknowledged their children would need to work throughout any additional schooling, and apply for scholarships and grants. Ultimately, Debtors have not shown sufficient evidence of an inability to maintain a minimal standard of living for a substantial portion of the repayment period.[27] As a result, Debtors have not met their burden, and fail to also meet the second prong of the *Brunner* test.

### 3. Good Faith

The third prong of the *Brunner* test requires the Court to determine if the debtor has made a good faith effort to repay the loan "as measured by his [or] her efforts to obtain employment, maximize income and minimize expenses."[28]

> The inquiry into a debtor's good faith should focus on questions surrounding the legitimacy of the basis for seeking a discharge. A

---

children during the loan repayment period. *See Marcotte v. Brazos Higher Educ. Serv. Corp. (In re Marcotte)*, 455 BR 460, 470 (Bankr. D.S.C. 2011) ("Additional circumstances encompass circumstances that impact on the debtor's future earning potential but which were either not present when the debtor applied for the loans or have since been exacerbated." (internal citations omitted)).

[26] The Tenth Circuit has actually stated that a debtor's financial condition should *improve* as children reach the age of majority. *See Alderete*, 412 F.3d at 1205 (quoting with approval the bankruptcy court's findings that "[a]s their children reach the age of majority, Plaintiffs will have less strain on their family budget."); *Innes*, 284 B.R. at 510 ("assuming a financial improvement after the two oldest children become self-supporting and childcare expenses end").

[27] *Educ. Credit Mgmt. Corp. v. Nys (In re Nys)*, 446 F.3d 938, 946 (9th Cir. 2006) ("[B]urden is on the debtor to provide the court with additional circumstances, i.e., circumstances, beyond the mere current inability to pay, that show that the inability to pay is likely to persist for a significant portion of the repayment period. The circumstances need be 'exceptional' only in the sense that they demonstrate insurmountable barriers to the debtors' financial recovery and ability to pay." (internal citations omitted)).

[28] *Buckland*, 424 B.R. at 889 (quoting *Innes*, 284 B.R. at 510).

-14-

finding of good faith is not precluded by a debtor's failure to make a payment. Undue hardship encompasses a notion that a debtor may not willfully or negligently cause his own default, but rather his condition must result from factors beyond his control.[29]

"The Tenth Circuit has also held that a debtors' willingness to consolidate his loan under the William D. Ford Federal Direct Student Loan Program's Income Contingent Repayment Program or Income Based Repayment is an important factor to consider in determining whether a debtor has made a good faith effort to repay a student loan debt."[30]

Despite their increased income, Debtors have not made a single payment on their student loan. Debtors are eligible for the REPAYE program, with a monthly payment of $210.06 per month for 20 years. Debtors freely admit they have not taken advantage of this repayment option, citing their increasing age and the possibility for future tax consequences from any debt that is forgiven.

ECMC argues that the issue of a potential future tax consequence is grossly overstated. First, it is true that numerous bankruptcy courts have chosen not to speculate about a potential future taxable event for a debtor at the end of a lengthy repayment period.[31] But in addition, as

---

[29] *Id.* (internal citations and quotations omitted).

[30] *Id.*

[31] *See, e.g,. Educ. Credit Mgmt. Corp. v. Bronsdon (In re Bronsdon)*, 421 B.R. 27, 35 (D. Mass. 2009) (concluding that it was legal error to determine that participation in an income based repayment program "would result in a tax liability" because, in part, "predictions of tax liability at the conclusion of the ICRP period are necessarily speculative"); *Jones v. Bank One Texas*, 376 B.R. 130, 142 n.11 (W.D. Tex. 2007) (stating that "forecasting such tax liability under whatever tax laws will be in effect in 25 years is sheer speculation" and "forecasting the effect any such liability would have on Debtor's actual standard of living at that time would be ever more speculative"); *Educ. Credit Mgmt. Corp. v. Stanley*, 300 B.R. 813, 818 n.8 (N.D. Fla. 2003) ("But it seems a stretch to assert that payment of student loans for 25 years under a federally approved program would create such a tax liability, even under today's tax laws. Forecasting such a tax liability under whatever tax laws will be in effect in 25 years would be sheer speculation. Forecasting the effect any such liability would have on [the debtor's] actual standard of living at that time would be even more speculative."); *Johnson v. Dep't of Educ. (In re Johnson)*, 543 B.R. 601, 610 (Bankr. W.D. Mo. 2015) (relying on prior decisions holding that

many other courts have also recognized, even under today's tax laws, a tax burden is not a foregone conclusion, because cancellation of a student loan debt after an income-based repayment period "results in taxable income only if the borrower has assets exceeding the amount of debt being cancelled."[32] Other courts have noted the same issue, and the relative uncertainty of this area of tax law.[33] In fact, in one case, both the District Court and Bankruptcy

---

the argument that a debtor would be subject to tax consequences at the end of an income based repayment program was "too speculative for consideration"); *Greene v. U.S. Dep't of Educ. (In re Greene)*, 484 B.R. 98, 118 (Bankr. E.D. Va. 2012) ("potential tax implications are too speculative to influence the determination of dischargeability of the Student Loan").

There are a few cases, of course, that hold differently. *See, e.g.*, *Todd v. Access Group, Inc. (In re Todd)*, 473 B.R. 676, 695 n.28 (Bankr. D. Md. 2012) (stating that there could be "serious tax consequences . . . that would negate the (income based repayment) program's superficial solution"), *Gregoryk v. United States (In re Gregoryk)*, No. 00-31050, 2001 WL 1891469, at *3 (Bankr. D.N.D. 2001) (agreeing with the reasoning in *Thomsen v. Dep't of Educ. (In re Thomsen)*, 234 B.R. 506, 512–14 (Bankr. D. Mont. 1999), that "a student loan obligation cancelled by the Secretary of Education must be recognized and treated as taxable income by the debtor" and finding that discharge is a better option because of "the large potential income tax burden that could result from the cancellation of a large student loan obligation upon which interest has accrued for twenty-five years"). But the overwhelming majority of courts conclude otherwise, as stated above. *See Gesualdi v. Educ. Credit Mgmt. Corp. (In re Gesualdi)*, 505 B.R. 330, 346 (Bankr. S.D. Fla. 2013) (citing cases and stating: "The vast majority of courts that have addressed this issue have concluded that it is speculative, at best, to guess what the tax laws will be in 25 years.").

[32] *Educ. Credit Mgmt. Corp. v. Jesperson*, 571 F.3d 775, 782 (8th Cir. 2009) (stating that "cancellation [of a student loan debt after an income-based repayment period] results in taxable income only if the borrower has assets exceeding the amount of debt being cancelled," citing 26 U.S.C. § 108(a)(1)(B)).

[33] *See, e.g.*, *Educ. Credit Mgmt. Corp. v. Rhodes*, 464 B.R. 918, 926 (W.D. Wash. 2012) (noting the debtor "did not submit evidence that he would incur such tax liability, despite the fact that he bore the burden of doing so, and the Ninth Circuit Bankruptcy Appellate Panel has discouraged speculation over the tax implications of participation in income-based repayment plans" and "courts have emphasized that cancellation of debt after 25 years of participation in income-based plans only results in tax liability if the borrower's assets exceed his liabilities immediately prior to the cancellation of the debt"); *Gesualdi v. Educ. Credit Mgmt. Corp. (In re Gesualdi)*, 505 B.R. 330, 346 (Bankr. S.D. Fla. 2013) ("[E]ven under existing tax laws, a taxpayer only has tax liability for debt forgiveness if he is solvent. . . . The amount of this student loan would be included in any calculation of the [debtor's] solvency, and the [debtor] did not put on any evidence to show that his assets, even at the time of trial, exceed his liabilities."); *Arroyo v. U.S. Dep't of Educ. (In re Arroyo)*, 470 B.R. 18, 31 (Bankr. D. Mass. 2012) ("[A] participant in an ICRP will realize taxable income only to the extent that, immediately before the

-16-

Appellate Panel came to seemingly opposite conclusions regarding tax consequences in different appeals in the same case.[34]

Regardless, in light of Debtors' considerably improved financial situation, coupled with Debtors' unnecessarily high expenses, the Court finds that Debtors' failure to make any material payments toward their student loan debt does not demonstrate their good faith effort to repay their student loan debt. Debtors have failed to meet their burden to prove the third and final prong of the *Brunner* test.

## III. Conclusion

For the reasons set forth above, the Court finds that the student loan debt owed by Debtors to ECMC should be excepted from Debtors' discharge pursuant to § 523(a)(8). The Court finds that Debtors have the ability to repay their student loans through the REPAYE

---

discharge, her assets exceed her liabilities. . . . In view of the fact that (i) [the debtor] has at present almost no assets and at least $300,000 in Student Loan debt and (ii) under an ICRP [the debtor] would be paying on this debt for the balance of such a plan to the extent of her ability, it is highly unlikely that, upon completion of her payments, her assets would exceed her liabilities.").

[34] Compare *Educ. Credit Mgmt. Corp. v. Bronsdon (In re Bronsdon)* 421 B.R. 27, 35 (D. Mass. 2009) (appeal of bankruptcy court's initial determination of dischargeability) ("First, tax liability is not certain to flow from the discharge of the remaining debt at the end of the 25–year period. [Section] § 108(a)(1)(B) [of Title 26, the Tax Code] excludes from gross income 'any amount which (but for this subsection) would be includible in gross income by reason of the discharge (in whole or in part) of indebtedness of the taxpayer if the discharge occurs when the taxpayer is insolvent,' provided that, under § 108(a)(3), 'the amount excluded under paragraph (1)(B) shall not exceed the amount by which the taxpayer is insolvent.' For the 'purposes of [section 108], the term 'insolvent' means the excess of liabilities over the fair market value of assets' at the time immediately before the discharge of the debt. 26 U.S.C. § 108(d)(3); *see Merkel v. Comm'r of Internal Revenue*, 192 F.3d 844 n.3 (9th Cir. 1999) (applying definition). The overall effect of these provisions is that, at the end of the 25–year period, a participant in the ICRP will experience a taxable event only to the extent that, after the discharge, her assets exceed her liabilities.") with *Bronsdon v. Educ. Credit Mgmt. Corp. (In re Bronsdon)*, 435 B.R. 791, 802–04 (BAP 1st Cir. 2010) (appeal after remand and bankruptcy court's second determination of dischargeability) (supporting the bankruptcy court's acknowledgment of the "significant tax liabilities under the ICRP").

program. While the Court finds that Debtors' current financial situation is likely to persist or, perhaps deteriorate slightly, they are not living a spartan lifestyle and their participation in the REPAYE program will not impose a spartan lifestyle upon them. Finally, in light of Debtors' considerably improved financial situation, coupled with Debtors' unnecessarily high expenses, the Court finds that Debtors' failure to make any material payments toward their student loan debt does not demonstrate their good faith effort to repay their student loan debt. Based on these findings, the Court finds that the repayment of the student loan debt should not be discharged.

IT IS THEREFORE ORDERED that student loan debt owed by Debtors to Education Credit Management Corporation is excepted from Debtors' discharge under § 523(a)(8).

IT IS FURTHER ORDERED that judgment is entered against Plaintiffs, George A. Johnson and Melanie Raney-Johnson, and in favor of Defendant, Educational Credit Management Corporation, on Plaintiffs' Complaint.

IT IS SO ORDERED.

###

ROBERT D. BERGER
U.S. BANKRUPTCY JUDGE
DISTRICT OF KANSAS